## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| APRIL FERRYMAN, | : | Case No. 3:16-cv-183 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

I.     **<u>Introduction</u>**

Plaintiff April Ferryman brings this case challenging the Social Security

Administration's denial of her applications for period of disability, Disability Insurance

Benefits, and Supplemental Security Income.  She applied for benefits on November 28,

2012, asserting that she could no longer work a substantial paid job.  Administrative Law

Judge (ALJ) Christopher L. Dillon concluded that she was not eligible for benefits

because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #6), the

Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. #11), the

administrative record (Doc. #5), and the record as a whole.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Dillon's non-disability decision.

## II.    Background

Plaintiff asserts that she has been under a "disability" since November 1, 2012. (Doc. #5, *PageID* #275). She was twenty-seven years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education. *See id.* §§ 404.1564(b)(4), 416.964(b)(4).

### A.    Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Dillon that when she is depressed, she has days that she does not want to get up, leave her house, or do anything. (Doc. #5, *PageID* #80). If she is working and gets depressed, she calls in sick. *Id.* She also "go[es] through very different moods at a time." *Id.* at 81. She explained that one word might change her mood from happy to angry within seconds. *Id.* Additionally, when something reminds her of her past, she either gets angry or starts crying. *Id.* When those episodes happen at work, she makes an excuse to leave early. *Id.* When she is uncomfortable around a person, "it freaks her out" and she has to go home or to a different area of her house. *Id.* at 83. Plaintiff was diagnosed with bipolar disorder. *Id.* at 87. Her symptoms include racing thoughts and impulsive behavior. *Id.*

Some of Plaintiff's mental health problems—specifically, her PTSD—worsened after the birth of her child. *Id.* at 83. Her PTSD, concern, and worry are related to being

raped as a child. *Id.* at 84. For many years, she self-medicated with marijuana and cocaine but then she was arrested and stopped using drugs. *Id.* At the time of the hearing, she had been clean for just short of three years and three months. *Id.* at 84-85. Now that she is not using drugs, she has to deal with the kind of thoughts that bother her. *Id.* at 85. Her medication helps but "they're still there and [she] can't just do something to make [herself] forget." *Id.*

Due to childhood trauma, Plaintiff is uncomfortable leaving her child with men and only she or her mother care for her child. *Id.* at 83.

> Q   Am I to understand [] that [your fiancée] is the father of
> your child; is that right?
> A   Yes, sir.
> Q   And yet you have issues in even allowing him to take care
> of his child?
> A   Yes.
> Q   Okay.
> A   To me, family is just as evil as a stranger.
> Q   That's how this all started for you, wasn't it?
> A   Yes.

*Id.* at 85.

Plaintiff has several crying spells throughout the day. *Id.* She also isolates herself at least twice per day. *Id.* at 86. Before her daughter was born, she locked herself into her room for twelve hours at a time with her bed in front of the door so no one could get in. *Id.* Since her child was born, she isolates herself for two to three hours at one time. *Id.* During that time, her daughter is either with her or with her mom. *Id.*

Plaintiff testified that she has asthma and two bulging discs in her lower back. *Id.* at 82. She also has problems with her left knee. *Id.* Her lower back pain began when

she twenty years old, and she had an MRI in 2012. *Id.* at 88. She began having hip pain with tingling down her legs after her daughter was born in September 2013. *Id.* At the time of the hearing, she was in physical therapy. *Id.* at 83.

Plaintiff is able to do dishes, but she sometimes has to leave them and come back later to finish them. *Id.* at 82. She does laundry occasionally. *Id.* However, if her anxiety escalates, she will leave clothes in the washer for several days and then will have to rewash them. *Id.* at 82-83. Plaintiff estimated that she can stand for approximately fifteen minutes at a time, walk one and one-half to two blocks at a time, sit for at least an hour, and has to watch lifting things over twenty-five pounds. *Id.* at 89. Further, her mood would prevent her from making it to work half the time. *Id.* at 90.

Plaintiff worked part time as a cashier in January 2013. *Id.* at 81. She only worked four to four and one-half hours in a day. *Id.* When she had to run the cash register and make pizzas at the same time, she got overwhelmed and left things like the oven on. *Id.* She was let go when she began having pregnancy complications. *Id.* at 82.

### B. Medical Opinions

#### i. Linda J. Griffith, M.D., Tracy Detwiler, PA-C, & Callie Hawkins, LISW-S

In May 2014, Dr. Griffith, Ms. Detwiler, and Ms. Hawkins completed a mental impairment questionnaire. *Id.* at 581-84. They diagnosed Plaintiff with bipolar disorder, most recent episode unspecified; post-traumatic stress disorder; and attention deficit hyperactivity disorder, combination type. *Id.* at 581. They assigned a global assessment of functioning (GAF) score of fifty-six. *Id.* Their clinical findings included depressed

mood, flat affect, tearful, nightmares and flashbacks of past trauma, irritable, racing thoughts, and easily distracted. *Id.* at 582. Plaintiff's signs and symptoms included: appetite disturbance with weight change, mood disturbance, delusions or hallucinations, recurrent panic attacks, feelings of guilt/worthlessness, difficulty thinking or concentrating, decreased energy, manic syndrome, and intrusive recollections of a traumatic experience. *Id.* at 581.

They opined that her prognosis was guarded to poor, and her response to treatment was fair. *Id.* at 582. She has a low stress tolerance and very poor adaptation skills. She would likely miss four or more days per month in a job setting due to mental health symptoms. *Id.* They opined she has extreme limitations in her ability to sustain an ordinary routine without special supervision; work in coordination with and in proximity to others without being distracted by them; complete a normal workday or workweek without interruptions from psychological-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers without distracting them or exhibiting behavior extremes; and respond appropriately to changes in a work setting. *Id.* at 583-84. They also indicated several areas where Plaintiff experiences marked limitations such as her ability to understand and remember detailed instructions and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. *Id.* at 583.

### ii. Callie Hawkins, LISW-S

Ms. Hawkins completed interrogatories related to her treatment of Plaintiff on April 14, 2014. *Id.* at 580. She began treating Plaintiff for bipolar disorder, post-traumatic stress disorder, and ADHD on November 20, 2012. *Id.* at 571-72. Ms. Hawkins opined, "[Plaintiff's] mental health diagnosis make it more difficult to tolerate the impact of her physical disabilities." *Id.* at 572. Further, Plaintiff is not capable of being prompt and regular in attendance; responding appropriately to supervision, co-workers, and customary work pressures; sustaining attention and concentration; understanding, remembering, and carrying our simple work instructions; behaving in an emotionally stable manner; relating predictably in social situations; demonstrating reliability; maintaining concentration and attention for extended periods; performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances; and accepting instructions and responding appropriately to criticism from supervisors. *Id.* at 574-79. Ms. Hawkins noted Plaintiff struggles with attendance in all settings, has a history of angry outbursts and conflicts at work, and experiences mood fluctuations that make reliability challenging. *Id.* Ms. Hawkins found that Plaintiff has a moderate restriction of activities of daily living; moderate deficiencies of concentration, persistence, or pace; and marked difficulties in maintaining social functioning. *Id.* at 580.

### iii. Caroline Lewin, Ph.D., & Irma Johnston, Psy.D.

Dr. Lewin reviewed Plaintiff's records in March 5, 2013. *Id.* at 101-11. She opined Plaintiff has two severe impairments: affective disorder and anxiety disorder, and

one non-severe impairment, substance addiction disorder.  *Id.* at 105.  Plaintiff has a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate deficiencies of concentration, persistence, or pace; and no repeated episodes of decompensation.  *Id.*  Dr. Lewin opined Plaintiff is able to perform three to four step tasks that do not have strict time or production demands, which require no more than occasional, superficial interactions with others, in a relatively static environment with few changes.  *Id.* at 108-09.

On June 20, 2013, Dr. Irma Johnston reviewed Plaintiff's records and affirmed Dr. Lewin's conclusions.  *Id.* at 126-36.

## III.  **Standard of Review**

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a).  The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir.

2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …."  *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Dillon to evaluate the evidence connected to Plaintiff's application for benefits.  He did so by considering each of the five sequential

steps set forth in the Social Security Regulations.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

He reached the following main conclusions:

Step 1:    Plaintiff has not engaged in substantial gainful employment since November 1, 2012.

Step 2:    She has the severe impairments of respiratory disorder, low-back disorder, left-knee disorder, obesity, affective disorder, and anxiety-related disorder.

Step 3:    She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:    Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds; pushing or pulling similar amounts; standing, walking, and sitting for 6 hours each; no more than frequent postural activity; no foot pedal operation; no more than occasional exposure to environmental extremes, such as dust, gas, fumes, heat, cold, humidity; no more than occasional interaction with supervisors, coworkers, and the public; no more than simple, routine, repetitive tasks performed with a pace and stress tolerance that allows for no production quotas."

Step 4:    She is unable to perform any of her past relevant work.

Step 5:    She could perform a significant number of jobs that exist in the national economy.

(Doc. #5, *PageID* #s 153-69).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 169.

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

**V.**    **Discussion**

Plaintiff contends that the failed to give appropriate weight to the treating sources' opinions and that the ALJ erred in finding that she was not credible. The Commissioner maintains that the ALJ reasonably assessed the opinions of the Plaintiff's mental health providers and substantial evidence supports the ALJ's finding that Plaintiff was not fully credible.

**A.**    **Opinions**

The ALJ gave the opinion of Plaintiff's treating mental health practitioners, Dr. Griffith, Ms. Hawkins, and Ms. Detwiler, "minimal weight." (Doc. #5, *PageID* #165). The ALJ addressed the opinion of all three together, without distinguishing Dr. Griffith as a treating physician and without discussing the treating physician rule. Under the rule,

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

The ALJ did not address the treating physician's rule, and as a result, the Court cannot engage in a meaningful review of the ALJ's decision not to give Dr. Griffith's opinion controlling weight.

However, even if Dr. Griffith's opinion is not entitled to controlling weight, the ALJ's review is not complete. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported … or is inconsistent with the other

substantial evidence … means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [the Regulations]."  Soc. Sec. R. 96-2p, 1996 WL 374188, at *4 (Soc. Sec. Admin. July 2, 1996).  These factors include "the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions.  *Wilson*, 378 F.3d at 544.  This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions."  *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5).  The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight.  *Id.*  Substantial evidence must support the reasons provided by the ALJ.  *Id.*

ALJ Dillon addressed some of these factors.  First, he considered internal inconsistency.  The ALJ noted that the three healthcare providers assigned Plaintiff a Global Assessment of Functioning (GAF) score of fifty-six, indicating moderate symptoms and limitations.  (Doc. #5, *PageID* #s 166-67).  He concluded that this score was supported by the record.  *Id.*  However, the ALJ found that the score was inconsistent with their marked and extreme limitations, and concluded, "the patent internal

inconsistency presented here weighs strongly against the persuasiveness of the treating source opinions described above."  *Id.* at 166 (citation omitted).

The ALJ erred in relying on Plaintiff's GAF scores to find that Dr. Griffith's opinion was internally inconsistent.  Notably, "the Commissioner 'has declined to endorse the [GAF] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  *DeBoard v. Comm'r of Soc. Sec.,* 211 F. App'x 411, 415 (6th Cir. 2006) (quoting *Wind v. Barnhart,* No. 04–16371, 2005 WL 1317040, at *6 n.5, 133 F. App'x 684 (11th Cir. June 2, 2005); 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)).  Further, the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) no longer uses the GAF scale, in part due to "its lack of conceptual clarity (*i.e.,* including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." Liza H. Gold, *DSM-5 and the Assessment of Functioning: The World Health Organization Disability Assessment Schedule 2.0,* 42 J. AM. ACAD. PSYCHIATRY & LAW 173, 174 (2014) (footnote omitted) (*available at* http://www.jaapl.org.  Search by article title).  The recent rejection of the GAF scale by the psychiatric professionals who created it and its lack of direct correlation with the requirements of the Commissioner's mental disorders listings exemplify the unreliability of such scores.

Moreover, ALJ Dillon recognizes:  "The GAF is only a snapshot opinion about the level of functioning ….  Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable

12

longitudinal picture of the claimant's mental functioning ...."  (Doc. #5, *PageID* #166).

Despite recognizing this unreliability, the ALJ still used the scores to reject Dr. Griffith's

opinion.  The ALJ reliance on Plaintiff's GAF score after identifying the unpredictability

of such scores is inconsistent and unreasonable, if not also baffling, and illogical.  As

such, it does not serve as a reasonable basis for rejecting Dr. Griffith's opinion.

The ALJ then addressed whether Dr. Griffith's opinion was consistent with

Plaintiff's treatment.  He found, "Were I to assign significant weight to the above

opinions, [Plaintiff] would undoubtedly be considered disabled, as she would likely

require extensive mental health care in a highly supportive living arrangement, especially

considering the multiple areas of extreme limitation noted in the latter Questionnaire."

*Id.*  The ALJ concluded that Plaintiff's treatment records did not contain any indication

that Plaintiff required such treatment, and "she remains quite capable of caring for her

young daughter without any particular assistance."  *Id.*

Importantly, the ALJ is not a physician or psychiatrist, and it is not his

responsibility to determine what treatment would "likely" be appropriate for an

individual with certain limitations—even when those limitations are extreme.  *See Rohan*

*v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to

play doctor and make their own independent medical findings.") (citations omitted).

ALJs may, however, consider the conservative nature of an individual's treatment.  *See*

*Kepke v. Comm'r of Soc. Sec.,* 636 F. App'x 625, 631 (6th Cir. 2016) ("The ALJ noted

that the records indicate Kepke received only conservative treatment for her ailments, a

fact which constitutes a 'good reason' for discounting a treating source opinion.")

(citations omitted). But, Plaintiff's treatment has not been conservative. Indeed, medication in combination with counseling is a common and often effective treatment regimen for bipolar disorder. *See generally Bipolar Disorder,* NAT'L INST. OF MENTAL HEALTH, https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml (last updated April 2016) ("Treatment helps many people—even those with the most severe forms of bipolar disorder—gain better control of their mood swings and other bipolar symptoms. An effective treatment plan usually includes a combination of medication and psychotherapy (also called 'talk therapy').").

The ALJ's reliance on Plaintiff's ability to care for her child is misleading. It does not show her ability to do mental work activities; it illustrates the severe symptoms of her post-traumatic stress disorder and thus supports Dr. Griffith's opinion. Plaintiff's PTSD is related to her being sexually abused by her father. (Doc. #5, *PageID* #s 84, 537). When Plaintiff got pregnant, she was "afraid of having a girl because she thinks she would suspect everyone of trying to molest her daughter the way she was molested by her father." *Id.* at 480. By January 2014, her past trauma was affecting her almost daily. *Id.* at 606. Ms. Detwiler noted, It "[b]egan [with a] dream of her dad raping her when she was 6." *Id.*

Plaintiff testified that as a result of her childhood abuse, she does not allow men to be around her daughter without her there. *Id.* at 83. Just the thought of leaving her child with the child's father or her step-father causes Plaintiff distress. *Id.* The ALJ asked Plaintiff at the hearing: "It sounds like you're very attentive, overly attentive because of your PTSD. So are you with your child all the time?" *Id.* at 91. Plaintiff explained that

only she and her mother care for her daughter. *Id.* Her stepfather is only able to help if

Plaintiff is in the same room or close by. *Id.* Even when Plaintiff's mother is watching

her daughter, Plaintiff is "eager to get home to her … to make sure that she is physically

okay with [her] own eyes." *Id.*

The ALJ acknowledges that Plaintiff's "overly attentive" care of her child is the

result of her PTSD. He then manipulates it to unreasonably find that she is not under a

disability. Plaintiff's attentive—bordering on obsessive—care of her daughter does not

establish that she is able to perform work activities on a sustained basis. *See Gayheart,*

710 F.3d at 377 ("[T]he ALJ does not contend, and the record does not suggest, that [the

plaintiff] could do any of these activities on *a sustained basis,* which is how the

functional limitations of mental impairments are to be assessed.") (citing 20 C.F.R. §

404.1520a(c)(2); 20 C.F.R. Part 404, Subpt. P, App. 1, at 12.00). Thus, this does not

constitute a good reason.

Next, the ALJ addresses the supportability of Dr. Griffith's opinion. He found,

"the treating sources apparently relied quite heavily on the subjective report of symptoms

and limitations provided by [Plaintiff], and seemed to uncritically accept as true most, if

not all, of what [Plaintiff] reported." (Doc. #5, *PageID* #166). In reaching this

conclusion, the ALJ fails to recognize that it can be considerably more difficult to

substantiate psychiatric impairments by objective laboratory testing:

> [W]hen mental illness is the basis of a disability claim,
> clinical and laboratory data may consist of the diagnosis and
> observations of professionals trained in the field of
> psychopathology. The report of a psychiatrist should not be
> rejected simply because of the relative imprecision of the

psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen,* 874 F.2d 1116, 1121 (6th Cir. 1989) (citing *Poulin v. Bowen,* 817 F.2d 865, 873-74 (D.C. Cir. 1987), quoting *Lebus v. Harris,* F.Supp. 56, 60 (N.D. Cal. 1981)).

In this case, Plaintiff's treating practitioners identified her diagnoses—bipolar disorder, PTSD, and attention deficit hyperactivity disorder—and their observations— "depressed mood, flat affect, tearful, nightmares and flashbacks of past trauma, irritable, racing thoughts and easily distracted"—and there are no reasons to question their diagnostic techniques. (Doc. 5, *PageID* #582). They noted that her treatment includes counseling two times per month and medication, and her response to treatment is fair. *Id.* They opined her prognosis is guarded to poor, she has a low stress tolerance, and she has very poor adaptation skills. *Id.* The treatment notes support their opinion, as they consistently document her crying, agitation, pressured speech, a depressed mood, angry affect, and poor focus. *Id.* at 447, 449, 451, 601, 606, 613, 616, 620, 628, 630-33, 635, 637, 480, 482, 489, 491. Although the treating practitioners undoubtedly relied, at least in part, on Plaintiff's reported subjective symptoms, both their opinion and treatment notes document their observations from extensive counseling.

The ALJ's reasons for rejecting and placing "little weight" on Dr. Griffith's opinion are not supported by substantial evidence and thus do not amount to "good reasons" for rejecting it.

The ALJ also gave "minimal weight" to Ms. Hawkins' interrogatory responses. He accurately observed that as a licensed independent social worker, Ms. Hawkins is not an acceptable medical source." *Id.* at 165-66 (citation omitted); *see* 20 C.F.R. § 404.1513(a). Instead, Ms. Hawkins falls under the category of "other sources." 20 C.F.R. § 404.1513(d). Evidence from "other sources" can only be used to show the severity of impairments and how it affects the claimant's ability to work. *Id.* While an ALJ is required to weigh and provide "good reasons" for discounting the weight given to a treating source opinion, an ALJ is not required to explain the weight given to "other sources." *Gayheart,* 710 F.3d at 376; Soc. Sec. R. 06-03p, 2006 WL 2329939, at *6 (Soc. Sec. Admin. Aug. 9, 2006).

Although "[i]nformation from these 'other sources' cannot establish the existence of a medically determinable impairment," the information "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Soc. Sec. R. 06-03p, 2006 WL 2329939, at *2. The same factors used to evaluate acceptable medical sources can be used to evaluate opinions from other sources. *Id.* at *4-5. Although not required by the Regulations, "the adjudicator generally *should* explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning…." *Id.* at *6 (emphasis added).

The ALJ is not required to explain the weight assigned to Ms. Hawkins's opinion. However, because Ms. Hawkins's treatment of Plaintiff is intertwined with Dr. Griffith's

treatment and resulting opinion, it is particularly relevant to this case. Additionally, the Social Security Administration recognized, "With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources'… have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled by physicians and psychologists." Soc. Sec. R. 06-03p, 2006 WL 2329939, at *3. This is particularly relevant in Plaintiff's case due to the extensive relationship between Plaintiff and Ms. Hawkins. (Doc. #5, *PageID* #s 434-79, 586-637). Further, even if the ALJ does not weigh Ms. Hawkins's opinion, the ALJ should, at the very least, consider the information she provides and the effect that her treatment of Plaintiff has on the weight of Dr. Griffith's opinion.

In comparison to the "minimal weight" he assigned Plaintiff's treating sources' opinions, the ALJ gave "significant weight" to the opinions of the State agency psychological consultants, Dr. Lewin and Dr. Johnston. (Doc. #5, *PageID* #165). The ALJ acknowledges that non-examining State agency consultants do not generally deserve as much weight as treating doctors. *Id.* But, they are entitled to some weight, "particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision). Indeed, when compared to [Plaintiff's] treating physicians' opinions, I have considered the State agency psychological consultants' opinions more reliable, for the multiple reasons discussed in detail below." *Id.*

The ALJ, however, does not discuss multiple reasons for finding the State agency psychological consultants' opinions reliable. Instead, he only notes that their opinions

that Plaintiff could only perform three to four step tasks with no strict time or production demands and could only have occasional, superficial interactions with others are supported by the evidence and "are well in line with the preponderance of the mental health treatment records since the amended alleged onset date, which are largely unremarkable and do not indicate a sustained progress of sub-baseline psychological functioning through the date of this decision." *Id.* (citing Exhibits 4F, 6F, 16F).

Dr. Lewin and Dr. Johnston's opinions cannot be "in line with" records that are "largely unremarkable" as Plaintiff's records are far from unremarkable. For example, Plaintiff's records illustrate her severe symptoms associated with bipolar disorder. *See Bipolar Disorder,* NAT'L INST. OF MENTAL HEALTH, https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml (last updated April 2016) ("Bipolar I Disorder— defined by manic episodes that last at least 7 days, or by manic symptoms that are so severe that the person needs immediate hospital care. Usually, depressive episodes occur as well, typically lasting at least 2 weeks. Episodes of depression with mixed features (having depression and manic symptoms at the same time) are also possible.).

Plaintiff first returned to treatment with Ms. Hawkins because her mood was unstable, and she was experiencing depressive and manic episodes. (Doc. #5, *PageID* #434). Those episodes are documented consistently throughout the record. Ms. Hawkins noted, for instance, on February 19, 2013 that her mood/affect was "manic, expansive" and her speech was pressured. *Id.* at 482. By March 6, her mood was stable. *Id.* at 481.

On March 22, Ms. Detwiler noted that Plaintiff's speech was mildly rapid/pressured, her mood was irritable, her affect was full, and her motivation was low. *Id.* at 489.

Treatment notes further demonstrate her persistent struggle with post-traumatic stress disorder. For example, she was "charged with felonious assault after a friend threatened to harm a child." *Id.* at 438. She also experiences nightmares and flashbacks to childhood sexual abuse on a regular basis. *Id.* at 594, 598, 601, 606.

Plaintiff's constant fight with these mental illnesses is well documented throughout her *remarkable* treatment record. Thus, the ALJ's assertion that Plaintiff's treatment records are "largely unremarkable" is not supported by substantial evidence.

The ALJ also erred by failing to apply the same level of scrutiny to the Dr. Lewin and Dr. Johnston's opinions as he applied to Dr. Griffith's opinion. *See Gayheart,* 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)) ("A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires."). For example, the ALJ failed to acknowledge that Dr. Lewin completed her assessment in March 2013 and Dr. Johnston completed hers in June 2013, both long before Plaintiff's treating practitioners completed theirs in May 2014.

Accordingly, Plaintiff's statement of errors is well taken.[3]

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's assessment of her credibility is unwarranted.

**B.    Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits.  *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).  The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking.  However, Plaintiff is entitled to an Order remanding

this case to the Social Security Administration pursuant to sentence four of §405(g) due to the problems discussed above.  On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff April S. Ferryman was under a "disability" within the meaning of the Social Security Act;

3.    This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.    The case be terminated on the Court's docket.

Date: May 22, 2017                                   *s/Sharon L. Ovington*
                                                     Sharon L. Ovington
                                                     United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).